

FILED

SEP - 1 2022

Clerk, U. S. District Court
Eastern District of Tennessee
At Chattanooga

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

| | |
|---|---|
| SAMUEL BLAKE KITTERMAN, ) | |
| ) | |
| Plaintiff, ) | Case No. 1-22-cv-224 |
| ) | Judge Varlan |
| vs. ) | Mag. Judge Lee |
| ) | |
| PULSE CENTERS LLC and PTW ) | |
| MANAGEMENT SERVICES, LLC, ) | |
| ) | JURY DEMAND |
| Defendants. ) | |

## COMPLAINT

Plaintiff Samuel Blake Kitterman ("Mr. Kitterman"), by and through counsel, files this Complaint and alleges as follows:

### I. NATURE OF THE CLAIMS

1. Mr. Kitterman brings this civil action against his former employer to redress sexual orientation discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").

### II. JURISDICTION & VENUE

2. This Court has original subject matter jurisdiction over the claims in this matter pursuant to 28 U.S.C. § 1331.

3. This Court has specific personal jurisdiction over Defendants, each a foreign limited liability company, because they transacted business in Tennessee and purposely availed themselves to this forum through their actions, including, but not limited to, the following: (1) Marketing, soliciting, and securing sales throughout Tennessee, including but not limited to on social media; (2) Recruiting and hiring Mr. Kitterman with the knowledge that he was a Tennessee resident; (3)

1

Permitting Mr. Kitterman to work remotely from his home in Chattanooga, Tennessee throughout the relevant time period; (4) Supplying Mr. Kitterman with office equipment for use in Tennessee; and (5) The claims herein arose from and are directly related to Defendants' contacts with this forum: unlawful employment practices during Mr. Kitterman's tenure with Defendants.

4. Venue is proper in the Eastern District of Tennessee pursuant to 28 U.S.C. § 1391(b) because Defendants, each an "entity" under the federal venue statute, are deemed to reside "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2). Further, this venue is proper because this is the judicial district in which a substantial part of the events giving rise to the claims for relief occurred.

### III. THE PARTIES

5. Mr. Kitterman is an adult citizen of the United States who resides in Chattanooga, Hamilton County, Tennessee. Mr. Kitterman was at all relevant times an "employee" within the meaning of 42 U.S.C. § 2000e(f).

6. Defendant Pulse Centers LLC ("Pulse Centers") is a Delaware limited liability company with its principal place of business located at 34 Center Road SE, Cartersville, GA 30121. Pulse Centers may be served with process through its statutory registered agent: Paul Webb, 475 E. Main Street, Cartersville, GA 30120.

7. Defendant PTW Management Services, LLC ("PTW") is a Georgia limited liability company with its principal place of business located at 34 Center Road SE, Cartersville, GA 30121. PTW may be served with process through its statutory registered agent: Tessa R. Webb, 34 Center Road SE, Cartersville, GA 30121.

8. Upon information and belief, Defendants together operate as a joint employer: PTW is owned

2

by or otherwise affiliated with Pulse Centers to provide human resources-related services. PTW staff supervised Mr. Kitterman and directed him to perform particular tasks at particular times or in a specified manner. PTW also trains and evaluates the quality of the workers' performance. Pulse Centers had the ability to affect the terms and conditions of Mr. Kitterman's employment, including making hiring and firing decisions. Defendants were at all relevant times an "employer" or "joint employer" within the meaning of 42 U.S.C. § 2000e(b) and Sixth Circuit case law.

## IV. ADMINISTRATIVE PREREQUISTIES

9. Mr. Kitterman has fulfilled all conditions precedent to the institution of this action under 42 U.S.C. §§ 2000e. A "Dismissal and Notice of Rights" letter was issued to Mr. Kitterman by the U.S. Equal Employment Opportunity Commission on June 3, 2022, a true and correct copy of which is attached to this Complaint as **Exhibit A**.

## V. FACTS

10. Defendants together operate as a manufacturer and distributor of pulsed electro-magnetic field devices, which purport to stimulate and exercise the body's cells to support "natural healing."
11. Defendants hired Mr. Kitterman in about March 2021 to work remotely from his home in Chattanooga, Tennessee.
12. Mr. Kitterman was initially hired as an executive assistant, but he was promoted to Creative Content Coordinator in about April 2021.
13. Throughout his tenure, Mr. Kitterman was a full-time, reliable employee.
14. Mr. Kitterman is also an openly gay male. As a teenager, he was forced into conversion therapy, the pseudoscientific practice of attempting to change an individual's sexual orientation or gender identity using psychological or spiritual interventions. Mr. Kitterman was eventually displaced

3

from his childhood home after coming out.

15. During his employment with Defendants, Mr. Kitterman's work colleagues and supervisors knew of his sexual orientation.

16. On August 26, 2021, Mr. Kitterman reported discriminatory behavior to Defendant's Human Resources Director, Dee Dee Potter ("Ms. Potter").

17. Mr. Kitterman told Ms. Potter about this background, including his sexual orientation and the trauma associated with forced conversion therapy and being rendered homeless as a teenager.

18. Mr. Kitterman explained that the discriminatory behavior was committed by his supervisor, Albert Moses ("Mr. Moses"), and newly rehired coworker Nathanael Flock ("Mr. Flock").

19. Mr. Moses and Mr. Flock are personal friends and white, heterosexual males.

20. Mr. Kitterman confided in Ms. Potter that he witnessed Mr. Moses judge and disqualify job applicants because they "look[ed]" like they would not "get along with the team."

21. Mr. Moses also made derogatory remarks about members of the LGBTQ community such as "anyone can be *whatever* they want these days." Mr. Moses' tone conveyed disapproval of and contempt for such individuals.

22. Mr. Moses referred to Mr. Kitterman as "sassy" and also deleted the pronouns from Mr. Kitterman's email signature, an action that Mr. Kitterman interpreted as being anti-gay and against inclusivity in the workplace.

23. Another employee told Mr. Kitterman that Mr. Moses is "sexist" and "racist."

24. Mr. Flock had previously been terminated from Defendants for poor job performance.

25. Mr. Flock had recently been rehired by Defendants in about July 2021, apparently due to his friendship with Mr. Moses.

26. Mr. Flock has a history of publicly and aggressively expressing homophobic views.

4

27. At the time of his rehire, Defendants were aware of Mr. Flock's homophobic views and rhetoric.

28. With this knowledge, and despite numerous more-qualified applicants for the position, Defendants rehired Mr. Flock even though he did not formally apply for the position.

29. Mr. Kitterman told Ms. Potter that Mr. Flock has a history of extreme homophobic behavior and publicly posts and shares these beliefs on his public Facebook profile, starting years prior and well into 2021.

30. Mr. Kitterman explained that Mr. Flock was very likely to bring his views into the workplace because Mr. Flock made clear that he is not willing to silently judge gay people; rather, he is going to boldly proclaim directly to gay people that they are living in sin, are demonic, and are going to hell.

31. Mr. Flock also publicly stated that homosexuality is akin to being a murderer.

32. Mr. Flock attributed high suicide rates among LGBTQ individuals to their "sinful" lifestyle.

33. Defendants have a "Use of Social Media" policy in their Employee Handbook, which states:

> Whether you're handling a corporate account or using one of your own, you should remain professional and avoid damaging our organization in any way. We expect all our staff to follow our policy.... We ask you to be careful when posting on social media, too. We also caution you to avoid violating our anti-harassment policies or posting something that might make your collaboration with your colleagues more difficult (e.g. hate speech against groups where colleagues belong to) ... Avoid any defamatory, offensive, or derogatory content. It may be considered a violation of our company's anti-harassment policy if directed towards colleagues, clients, or partners.... We may have to take disciplinary action leading up to and including termination if employees do not follow this policy's guidelines.

34. Defendants' social media policy applies to employees' private Facebook profiles.

35. Mr. Kitterman explained that Mr. Moses transferred some of Mr. Kitterman's job duties to Mr. Flock, which he believed was the result of Mr. Moses and Mr. Flock's shared animus toward Mr. Kitterman's sexual orientation.

36. Mr. Kitterman explained that, due to Mr. Flock's extreme and in-your-face anti-gay rhetoric, he

was uncomfortable working with Mr. Flock on projects.

37. Ms. Potter shared Mr. Kitterman's concerns over Mr. Flock's public homophobic posts.

38. Ms. Potter assured Mr. Kitterman that he raised valid points and Defendants do not allow such social media posts.

39. Ms. Potter stated that she was uncomfortable with Mr. Flock's posts and that she had "plenty" of evidence to remedy the situation.

40. Ms. Potter stated that Mr. Flock signed the employee handbook, agreeing not to engage in such behavior.

41. Ms. Potter ended the meeting by stating in effect, "Don't worry. Know that I'm going to take care of this."

42. In a follow-up email to Ms. Potter on August 26th, Mr. Kitterman again provided examples of what he believed to be discrimination and retaliation committed by Mr. Moses against him.

43. Mr. Kitterman also reiterated that he was concerned that Mr. Moses' close friendship with Mr. Flock impacted Mr. Kitterman's workload and fair treatment as a gay person working for Defendants.

44. In the email, Mr. Kitterman provided hyperlinks to four of Mr. Flock's public online videos, that together contain dozens of homophobic remarks.

45. The next day, August 27, 2021, Ms. Potter and Mr. Kitterman had a follow-up Zoom meeting.

46. During this second meeting, Ms. Potter emphasized that Mr. Moses "definitely" wanted to progress Mr. Kitterman's career with Defendants and that Mr. Moses was happy with Mr. Kitterman's job performance because he was doing a good job.

47. However, Ms. Potter's attitude regarding Mr. Flock's homophobic Facebook posts shifted 180 degrees.

6

Case 1:22-cv-00224-TAV-SKL   Document 1   Filed 09/01/22   Page 6 of 9   PageID #: 6

48. Now, despite Defendants' clear social media policy and Ms. Potter's understanding of that policy, she now stated that she could do nothing about Mr. Flock's "private" Facebook posts because of the "First Amendment." Defendants are a non-governmental employer.

49. Ms. Potter's about-face concerning Mr. Flock's posts, immediately after she spoke with Defendants' upper management, confirmed to Mr. Kitterman that Defendants support or at least fully condone anti-gay rhetoric.

50. Mr. Kitterman reemphasized that he believed Mr. Moses and Mr. Flock's shared homophobic beliefs resulted in adverse actions against him, as stated in his email to Ms. Potter the day before.

51. Mr. Kitterman also made clear that Defendants' knowledge of Mr. Flock's homophobic views prior to rehiring him to work *with Mr. Kitterman* on the marketing team made Mr. Kitterman feel unwelcome.

52. Ms. Potter restated that nothing could be done and finished this second meeting by reinforcing that Mr. Kitterman was doing a "good job."

53. About one week later, Mr. Kitterman was given a "performance improvement plan" for alleged performance deficiencies, despite the repeated assurances from Mr. Moses and Ms. Potter that Mr. Kitterman was doing a good job and had nothing to worry about.

54. On September 17, 2021, Defendants terminated Mr. Kitterman's employment for alleged performance deficiencies.

55. Defendants' justifications for the termination are pretext.

56. Defendants fired Mr. Kitterman due to his sexual orientation and protected activity.

## VI. CAUSES OF ACTION

### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* (Sex Discrimination, Hostile Work Environment, and Retaliation)

57. Mr. Kitterman incorporates the forgoing facts as if fully restated herein.

7

58. Title VII prohibits an employer from taking adverse employment actions against an employee because of his "race, color, religion, sex..." 42 U.S.C. § 2000e, *et seq*.

59. Sexual orientation is a prohibited basis for discrimination under Title VII. *See Kilpatrick v. HCA Human Res., LLC*, 838 F. App'x 142, 145 (6th Cir. 2020) (*citing Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741, 207 L. Ed. 2d 218 (2020)).

60. Defendants violated Title VII when they terminated Mr. Kitterman's employment because of his sex, sexual orientation, and/or because he engaged in the protected activity of reporting discrimination in the workplace.

61. Defendants' actions created a harassing and hostile work environment based on Mr. Kitterman's sex and sexual orientation.

62. Defendant is liable for the actions of its employees and agents.

63. As a proximate result of Defendants' actions, Mr. Kitterman has been and continues to be damaged in an amount to be determined at trial.

64. Consistent with 42 U.S.C. § 1981a, Mr. Kitterman is entitled to punitive damages because Defendants engaged in a discriminatory practice or practices with malice or reckless indifference to Mr. Kitterman's federally protected rights.

## VII. PRAYER FOR RELIEF

65. Based on the foregoing, Mr. Kitterman prays for the following relief:

   A. Economic damages in the amount of any wages, salary, employment benefits, or other compensation, including, but not limited to back pay, plus prejudgment interest, in an amount to be determined at trial;

   B. Reinstatement or, in the alternative, front pay in an amount to be determined at trial;

8

C. Compensatory damages in an amount to be determined at trial;

D. Punitive damages in an amount to be determined at trial;

E. Reasonable attorneys' fees incurred in pursuing this action against Defendants;

F. All costs and expenses incurred in pursuing this action against Defendants;

G. A tax offset to mitigate the tax burden of a lump sum award;

H. Injunctive relief barring Defendants from undertaking such discriminatory practices against other employees, mandating sexual orientation bias training, and taking other such injunctive action as the Court finds appropriate; and

I. Such other legal and equitable relief to which he may be entitled.

## VIII. JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Mr. Kitterman demands a trial by jury on all claims and issues that are triable.

Respectfully Submitted,

CURT M. MASKER, TN Bar No. 037594
(*Application for Admission Pending and Motion for Admission Pro Hac Vice Filed Herewith*)
THE MASKER FIRM
810 Dominican Drive, Suite 314
Nashville, Tennessee 37228
Telephone: (615) 270-2098
Facsimile: (615) 821-0632
curt@maskerfirm.com

*Counsel for Mr. Kitterman*